NATIONAL ELECTRIC SIGNALING CO. v. DE FOREST WIRELESS
TELEGRAPH CO. et al.

(Circuit Court, S. D. New York.   October 16, 1905.)

1. PATENTS—CONFLICTING CLAIMS TO INVENTION—PRESUMPTION FROM GRANT
OF PATENT.
    The fact that an invention was first operated by another than the
    patentee does not rebut the presumption of invention by him, arising
    from the granting of the patent, where both persons were present at
    the time of such operation and each claims to have been the originator
    of the experiment from which the invention sprung.

2. SAME—INFRINGEMENT—WIRELESS TELEGRAPHING APPARATUS.
    The Fessenden reissue patent, No. 12,115 (original No. 727,331), for a
    receiver for electro-magnetic waves, *held*, not anticipated by patents Nos.
    716,000, and 716,203, dated December 16, 1902, and granted to De Forest
    and Smythe, nor covered by No. 706,744, dated August 12, 1904, and grant-
    ed to Fessenden, this patentee, and to be valid as against the claim that
    the invention was made by another than the patentee.   Claims 11, 23,
    and 25 also *held* infringd.

3. SAME—SUIT FOR INFRINGEMENT—COSTS.
    Rev St. § 973 [U. S. Comp. St. 1901, p. 703], providing that costs shall
    not be recoverable when a decree is entered for infringement of part of
    a patent, where the patentee has claimed to be the inventor of a mate-
    rial part of the thing patented, of which he was not the inventor unless
    a disclaimer was entered prior to the bringing of the suit, applies only
    where a disclaimer is necessary to save the patent.

In Equity.   Suit for infringement of reissued letters patent No.
12,115 (original No. 727,331), for a receiver for electro-magnetic
waves, granted to Reginald A. Fessenden May 26, 1903.   On final
hearing.

William Houston Kenyon, for plaintiff.
Philip Farnsworth and Richard N. Dyer, for defendants

WHEELER, District Judge.   In a wireless telegraph system the
electric impulses of the Hertzian waves are received by an aerial wire
and taken to ground past a gap between electrodes having connection
with a local battery, the current of which is so affected by changing
the resistance to the local current at the gap as to cause it to give
signals.   The impulses are so very slight that the means for affecting
the local circuit by them must be of the most extreme delicacy.   It
came to be done most prominently by arranging the electrodes so
near together that bridges would be formed by minute particles tak-
en by the current from the local battery from one electrode to the
other, so delicate that the impulse would break them and thereby so
interrupt the local current as to cause it to give a signal, as described
in patents Nos. 716,000 and 716,203, dated December 16, 1902, and
granted to De Forest and Smythe, and by taking the impulse through
such an extremely fine wire loop that the heat generated there by the
impulse would so change the local current as to cause it to give a sig-
nal, as described in patent No. 706,744, dated August 12, 1902, ap-
plied for, before those of De Forest and Smythe, by, and granted to,
Reginald A. Fessenden.

140 F.—29

This suit is brought upon reissued patent No. 12,115, dated May 26, 1903, and granted to Fessenden for an improvement on the former patented invention mentioned, consisting of a liquid connection between extremely fine and comparatively large electrodes, the original of which was No. 727,331, dated May 5, 1903, the day of the application for the reissue. The former device of Fessenden is called a hot wire barretter, and the latter a liquid barretter. The drawing of Fessenden's patent 706,744, on which this reissue is an improvement, shows a glass bulb, 17, into the top of which wires lead in and out from air to ground through a glass brace, 19, and form a loop, 14, in a silver shell, 18; and the specification says:

"In the practice of my invention a silver wire one-tenth (.1) of an inch in diameter and having a platinum core about three one-thousandths (.003) of an inch in diameter is drawn down until the external diameter of the silver wire is about two one-thousandths (.002) of an inch in diameter and the platinum wire is about six one-hundred thousandths (.00006) of an inch in diameter. These dimensions can be varied in accordance with the conditions under which the receiver is to be used, provided the low heat capacity is maintained, as hereinafter described. A short piece of the wire thus prepared is fastened to the leading-in wires, 16, and bent to the form of a loop, 14. The tip of this loop is immersed in nitric acid to dissolve the silver from the tip and leave a small portion of the loop free from silver, without reducing the cross-section or mass at the end or terminals, so that the latter will be capable of facilitating ·the reduction of temperature of the loop by conduction, especially when receiver is placed in a vacuum. Such a receiver will fulfill the conditions necessary for rapid and distinct signaling (i. e., a capability of changing from and back .to normal condition nearly instantaneously), dependent only upon the length of the signal ·(i. e., whether long or short). As the receipt of signals is here dependent upon currents produced by electro-magnetic waves, the requirement above stated is fulfilled by the loop, 14, as it has small volume, and consequently the loop has small heat capacity; i. e., is capable of being raised quickly an appreciable amount in temperature, with a consequent increase in resistence, by a small amount of heat, and is also capable of cooling rapidly."

"It is preferred that the loop, 14, should be inclosed in a glass bulb, 17; the platinum leading-in wires, 16, being sealed in the wall of the bulbs, so that a vacuum may be· formed and maintained in the bulb. The vacuum is not, however, necessary, as the bulb may contain air or paraffin; but the vacuum is preferred, as less energy will be required to produce a good effect. As a further means of avoiding radiation of heat, the loop may be inclosed· in a silver shell, 18; the shell being slipped over the loop and clamped to a small glass brace, 19, on the leading-in wires, corrugated for this purpose."

The loop was so fragile that in use it often broke, and the behavior of the currents in the parts while it was broken became important in leading to the invention in question.

The reissue shows several methods of practicing the invention, and the drawing of the fifth method, principally in question (figure 5) shows an aerial wire, 1, with a platinum tip, 12, in a vessel, 4, containing liquid, and a wire, 13, leading from the liquid through the bottom of the vessel to ground. The specification says:

"A fifth method is to insert a small piece, 12, of platinum or similar material, into a liquid, such as nitric acid, so that it is only immersed a short distance. Fig. 5 shows such an arrangement, the platinum wire being covered with silver. The silver wire has a diameter of about .003 of an inch, and the platinum core inclosed therein has a diameter of about .00004 of an inch. The silver is removed or eaten off from the lower extremity, and the platinum core projects into the solution of nitric acid. This solution of nitric acid,

which preferably contains nitrous acid, is covered by a layer of kerosene oil, so as to prevent evaporation of the acid and to prevent the platinum from being fused. A second platinum wire, 13, is also immersed in the liquid, preferably by inserting it through the bottom of the vessel, 4, and these wires are connected to the vertical and to ground, and also included in the indicating circuit. It follows from the well-known electrical formula giving the resistance of a cylindrical body in a conducting medium that practically all the resistance is localized and concentrated within a short distance of the point where the platinum wire, 12, projects into the acid. For example, if platinum of a diameter of .00004 of an inch should be immersed in acid to a depth of .00002 of an inch, practically all the temperature effects would be local, or take place inside of a hemisphere of liquid whose radius would be .00004 of an inch. * * * The immersion of the terminals should be such as to insure what is known in the art as a 'perfect contact' between the terminals and liquid."

"It is found that certain liquids act better than others—as, for example, though carbonate of soda, caustic soda, nitrate of potash, and other substances give good results, it is preferred to use nitric acid, for the reason that the effects are stronger with it than with most other liquids, and in the case of a burn-out it is sufficient to screw down the platinum wire until it is again immersed."

"It is to be noted that in the case of the liquid barretter the action of the electro-magnetic waves is to cause a greater current to pass in the local circuit, owing to the fact that the conductivity of electrolytes increases, instead of decreases, with heat. With liquid barretter having a resistance of between 600 and 2000 ohms, the increase of conductivity when the liquid is heated is so marked as to permit of the operation of a siphon recorder or relay, though a telephone may be used."

There are 39 claims. Those in question are:

"(3) A receiver for electro-magnetic waves, consisting of a small quantity of liquid adapted to have its resistance decreased by the action of electro-magnetic waves, substantially as set forth."

"(6) A receiver for electro-magnetic waves, consisting of a small quantity of nitric acid, substantially as set forth."

"(11) An electrical receiver, consisting of a liquid and an extremely fine terminal projecting into the liquid, substantially as set forth."

"(23) In an electrical wave detector, the combination of a liquid and a terminal projecting thereinto, and having in the liquid so small an immersed area that a highly resistant layer is formed about the terminal, substantially as described.

"(24) In an electrical wave detector, the combination of a liquid with a terminal projecting thereinto, and having so small an immersed area that a highly resistant layer of liquid is formed about the terminal, substantially as described.

"(25) As a telegraphic receiver, the combination of a liquid and an extremely fine terminal projecting into the liquid, and so arranged that the passage of an electric current will produce thermal effects in the liquid, substantially as described.

"(26) An electrical receiver, comprising a liquid and means for transforming the electrical energy received into energy of a different form in a localized part of the liquid, said means being adapted to receive and accumulate such transformed energy, substantially as described."

"(28) As a means for detecting received electric waves, a liquid adapted to have its resistance changed by the received energy, in combination with means for localizing said change of resistance in said liquid, substantially as described."

The defenses are anticipation by the patents, and corresponding knowledge and use, and that this part of the invention of the reissue was discovered and made by Frederic K. Vreeland, and not by Fessenden.

The prior patents mentioned so stand about this invention that they cover all anticipation that anything does, and if they do not show it nothing in the case appears to.

The specification of patent 716,000 to De Forest and Smythe says:

"Referring now more particularly to the responsive device or detector of our invention, we have found that when two metallic electrodes are slightly separated and included in series in a circuit containing a source of current, and a suitable medium is interposed in series between their opposed surfaces, minute metallic particles are torn off from the anode and carried across the gap separating the electrodes to the cathode, where they build up little trees and bridges, which extend out toward and soon reach the anode, thus bridging the gap. As long as these bridges continue between the electrodes, the resistance of the device is comparativley low; but if it is subjected to the influence of an electrical impulse or oscillation, such as results when a spark passes between the terminals of an induction coil, the metallic bridges between the electrodes are instantly disrupted, and the resistance of the device increases greatly. If a signal-receiving device be included in the local circuit with the detector, this change in resistance is made manifest, and the passage of the impulse is signaled. Between each spark at the apparatus employed in the production or generation of the oscillations these bridges between the electrodes are again built up, or rather on the cessation of the impulse or oscillation the metallic particles again form into chains across the gap, and so automatically restore the conductivity of the device."

The specification of 716,203, after stating that the variable resistance conductor placed in the local circuit between the aerial conductor and the ground wire includes two electrodes, says:

"Which may be plane-faced bars overlapping each other, as shown, or may have such other form and relative positions as will bring their opposed faces of suitable area into approximately parallel positions of slight separation. In our experiments thus far we have found that liquids interposed between the electrodes give the most satisfactory results. The space between the overlapping faces of the two electrodes being thereby filled with the liquid, which, being interposed in series between the electrodes, forms the connection between the electrodes, and thus completes the conductor. The passage of the wave through the conductor greatly increases its resistance, and since the variable resistance conductor is in the local circuit this change of resistance is indicated by the telephone or other signaling device, which is also in the local circuit. The best way, however, in which we have contemplated maintaining the constant pressure of the interposed liquid between the electrodes, is to employ a suitable porous material constantly saturated with the liquid and to interpose such porous material between the electrodes. Our experiments have demonstrated that such arrangement results in the production of the best effects, and our theory is that the porous material operates to retain the particles of metal which are detached from one electrode by the passage of the current and carried toward the other electrode, and to prevent such metallic particles from becoming precipitated or from settling to the bottom of the vessel or receptacle containing the liquid in which the electrodes are immersed. When the electrodes are immersed in a liquid contained in an open vessel, as shown in the drawings, it is desirable that all those parts of the electrodes except the actually overlapping surfaces or juxtaposed portions be varnished or otherwise so insulated as to prevent any possibility of short-circuiting through the liquid. In referring to the overlapping or opposed surfaces of the electrodes, we do not intend to impose any limitation so far as the extent of area of the opposed surfaces is concerned. In fact, we have obtained excellent results from the use of two electrodes; one having a plane surface of considerable area and the other having a thin or V-shaped edge parallel to the plane surface of the first."

This comparison seems to show clearly that Fessenden's patent for the hot wire barretter does not cover the invention of the patent in suit, so as to prevent a subsequent patent of it to himself which would be valid. James v. Campbell, 104 U. S. 356, 26 L. Ed. 786. As it was patented, it could only operate by heat on the fine wire of the loop to affect the resistance in the local circuit to give a signal; and no use shown of the fine terminal of a broken loop could defeat a patent for such a terminal in any combination, for it was all within the two years prior to the application saved by the statute.

It also seems to show that the De Forest and Smythe receivers operate by bridges formed by the local circuit between closely parallel electrodes, and broken by the aerial impulse to give the signal, while this does not appear to operate by the making or breaking of any such bridges, but by a fluid path between the electrodes at variable distances. The "thin or V-shaped edge" of one electrode, "parallel to the plane surface of the other," with liquid between, of 716,203, are relied upon, and argued, as being the extremely fine and coarser terminals with the liquid about them of this patent, or as being the same, except as to differences of comparative size and proportion. There is truly a suggestion of comparatively fine and coarse terminals with liquid between, but the operation would, from the other parts of the description, be understood as performed by making and breaking bridges, instead of by a fluid path, which is not doing the same thing in the same, or substantially the same, way as the devices of the reissued patent. And while the general suggestion is of relatively small and large terminals, there is no description of any definite size of either, the discovery and planning of which might involve the exercise of such ingenuity as to amount to patentable invention, as the putting to a new use may. Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275. In this view this part of the patent seems to be valid for what it covers, if the invention was made by Fessenden. It might be owned by him, if made by Vreeland with the right to patent it in the name of Vreeland; but he could not have the right to patent it in his own name unless he made it himself.

This question arises between Fessenden and Vreeland upon the evidence, and rests largely upon their testimony and the circumstances. The invention came from the hot wire barretter, as is shown by the face of the patent in referring to it as an improvement upon that; and the use of a fine terminal in nitric acid as an electrode appears to have been brought to the attention of Fessenden previous to Vreeland. Fessenden had been giving almost the whole of his attention with adequate skill to this subject in the employ of the government, and afterward in his own establishment at Fortress Monroe, with assistants, appliances, and conveniences. Vreeland had been a capable assistant two weeks, and was experimenting with the hot wire barretter under direction of Fessenden, in the same room. The operation of the currents in the appliances was, as always, very subtle, and to be found by trial. Fessenden suggested using the fine terminal with the liquid, and a change from the positive to the negative side. This operated favorably, as was observed by Vreeland, and was brought to the attention of Fessenden. Vree-

land did not know all that Fessenden had known before, nor but that what was new to him would be so to Fessenden, and seems to have thought he made the discovery, while in fact it was a step in Fessenden's continuous investigations. It is argued that, as Vreeland first operated the invention, the prima facie effect of the patent is rebutted, and cannot be maintained without full proof of still prior operation by the patentee. But, however this might be after adequate proof of prior independent use by another, it does not seem that in case of contemporaneous claims of invention ·such burden can properly be put upon the patentee. On the whole the patent appears to be valid according to its face.

The foundation of the proof of infringement is this stipulation, the drawings in which are lettered accordingly:

"It is admitted by defendant companies that prior to the commencement of this suit and subsequently to May 26, 1903, defendant companies made, used, and sold in the Southern District of New York apparatus like in all respects to the apparatus described in the following description and illustrated in the annexed drawing:

"Description.

"This apparatus is a part of the receiving station equipment of a wireless telegraph system, and consists of a square wooden box, A. On top of same is mounted a hard rubber cylinder, B, containing a small glass tube, C, closed at the bottom, which glass tube contains a saturated solution, D, of caustic potash. Projecting into that solution through the bottom of the tube is a wire, E, of No. 28 gauge. On top of the hard rubber cylinder is mounted a metal bridge, through the center of which an adjusting screw is fixed, a Wollaston wire, being a fine silver-coated platinum wire, G, the diameter of the platinum core being thirty-eight one-millionths (.000038) of an inch, and of the silver-coated part one-thousandth (.001) of an inch. The lower end of the wire dips into the said solution. The length of the part of this wire which is thus immersed is equal to between 200 and 500 times the diameter of the platinum core. The silver coating of the wire was previously removed to a distance of about one-sixty-fourth of an inch from the end, by dissolving in a suitable acid. L, L,' and L'' are switches connected to the parts of the apparatus contained in the square wooden box. The drawing shows a number of binding posts which are suitably connected to the electrical circuits."

Here are the extremely fine terminal from the aerial wire of exactly the dimensions of that in the patent, with the liquid in connection with the local circuit, and the terminal leading to ground. The liquid seems to be an equivalent of nitric acid for this purpose, and the testimony shows that to have been sometimes used. This seems to make out infringement so far as valid claims cover it. The substance of the invention is the arrangement of the extremely fine terminal and short projection into the liquid, with aerial, ground, and local circuit connections. What was new only was required to be described. What was old and would be understood by those skilled in the art would be read in, the same as if described. Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177.

None of the claims seems to have been so framed as to very exactly fit the invention, but the eleventh, twenty-third, and twenty-fifth may perhaps be properly so construed as to cover it; and if they can be, according to well-settled principles applicable to such cases, they of course should be. In the eleventh, the description "extremely

fine" may apply to the extent of immersion as well as to the diameter of the terminal, leaving the ordinary ground terminal to be understood; in the twenty-third the description "so small an immersed area" may apply to both the diameter and length of the immersion; and so of the twenty-fifth, except the limitation to production of thermal effects. There is a dispute as to whether the change of resistance is thermal or otherwise; but that does not seem material, except as to this limitation. If the same physical appliances produce the same results, they cannot be justly said to do it in different ways because of such merely disputable variances in hidden processes. The substantial identity of the structure does not seem to be thereby prevented. The sixth claim seems to be only for the nitric acid as new, which probably cannot be upheld, and the third, twenty-fourth, twenty-sixth, and twenty-eighth are so general as to leave their validity and application doubtful, and they are not now passed upon.

Decree for plaintiff as to eleventh, twenty-third, and twenty-fifth claims.

### In Settlement of Decree.

### (November 8, 1905.)

The individual defendants seem to be proper parties, and liable to injunction, although not to costs, and for profits and damages, if participated in as individuals. The statutes restricting costs upon filing a disclaimer after suit seem only to apply where a disclaimer is necessary to upholding the patent, and is filed for the purpose of saving it. That is not the situation here. No part of the invention set forth to which the claims held valid apply needs to be disclaimed to make or leave them valid. The doubt about those in question not held to be valid arises from their description of what is claimed, and not from failure of right of the patentee to what they might have covered. The various forms of claims for the same thing need not all be valid; and those that for indescription are not valid need not be disclaimed in order to recover upon those that describe the actual invention. That costs were not mentioned was not intended to indicate that they should not follow the recovery.

The decree is made to conform to these views.