## BUER v. MONTGOMERY WARD & CO.
### No. 330.

United States District Court
E. D. Kentucky, Covington Division.
July 27, 1949.

450

. Wood, Arey, Herron & Evans, Cincinnati, Ohio, for plaintiff.

Henry L. Burkitt, New York City, Charles S. Adams, Covington, Ky., for defendant.

SWINFORD, District Judge.

This is an action to recover for the infringement of patent No. 2,371,472, on claims 2 and 3. The article involved is a small folding push cart for carrying groceries from the store in which they were purchased to the home or automobile of the purchaser. The cart is set on wheels, is light and maneuverable and when emptied of its contents can be collapsed and hung behind a door, set in a corner or put under a bed.

While the action is based on two claims, numbered 2 and 3, it is obvious that these claims are almost identical and the case can be considered, from all legal standpoints, as involving only one claim. The only real difference between claims 2 and 3 is a recitation that the wheels extend below the body.

Four defenses are advanced. It is first contended that the Court is without jurisdiction because the article alleged to have infringed was never in this district. The record shows that the witness George Schwenzer called at the defendant's store in Covington, Kentucky, and asked for one of the carts displayed in its catalogue. He was advised by the clerk that the article was out of stock but she would have one sent to him. He thereupon paid for the cart and had it sent to a Cincinnati, Ohio, address. The cart was received in due time. I am of the opinion that this was a sale of the allegedly offending article within this district and that the Court has jurisdiction. The article was shown to be held for sale and a sale consummated in Covington, Kentucky. The cart was later delivered as a result of the transaction, which was fully completed in this district. that is sufficient to show an act of infringement within this district. Chicago Pneumatic Tool Co. v. Philadelphia Pneumatic Tool Co., C.C., 118 F. 852. Under the Uniform Sales Act of Kentucky a

"sale" includes a bargain and sale as well as a sale and delivery. Section 361.760, Kentucky Revised Statutes.

The second and third defenses are the usual defenses in patent cases. (a) The Patent is invalid for lack of invention, and (b) no infringement, or that the defendant's article is different from the patented item.

A patent is a monopoly for a given number of years. It means that only one person or firm, their heirs and assigns have a right to sell the thing patented without their consent. Consequently courts are and should be slow to grant this monopoly without convincing proof of invention. Further than this, invention means just what a definition of the word implies, some entirely novel creation or a valuable and distinguishable improvement over the prior art.

The plaintiff, here does not claim that any of the mechanical devices which are used by her were her own original ideas, but she does claim that a combination of these various devices into the folding push cart was a novel idea which had never before been patented and that it was a distinct improvement and invention over any prior art.

I must first decide whether or not this is invention.

It would serve no useful purpose to meticulously compare the patent in suit with all of the patents filed by the defendants as having been the same thing before the plaintiff was granted her patent. None of them do more than establish that certain of the mechanical results which the plaintiff adopted were patented before the Buer push cart. With this the plaintiff has no quarrel as her claim to an original idea is not whether the hinges, the axel or the shape of the container have been invented prior to the date of her patent, but that a combination of these and other things has created a new and hitherto unknown article whose novel utility has created a popular demand.

The Richie patent, defendant's exhibit number 2, more nearly approaches the patent in suit, but that was a cloth bag rather than a rigid box. It was apparently not successfully launched upon the market and a comparison of the drawings with those of the patent in suit will quickly demonstrate a marked difference in inventive purpose and the uses to which each can be put. I believe by such an examination the examiner in the United States Patent Office in applying the law as contained in the statute, 35 U.S.C.A. § 33, felt that the plaintiff had successfully explained the "principle" and "best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions" and "point out and distinctly claim the part, improvement, or *combination* which he claims as his invention or discovery." (Italics supplied.) In this way she contends the statutory requirements for utility are satisfied. 35 U.S.C.A. § 31.

As to the defense of no invention, I think the case falls squarely within the rule recognized by this Court in McEuen v. Kelley-Koett Manufacturing Co., 34 F. Supp. 351. There it was said:

"The plaintiff does not contend that he has created any element or mechanical device that has not hitherto been known and used efficiently, but that his contribution to the art was a novel combination of various known features, which combination was not before known and which proved to be an outstanding advance in the art. He rests his case on the rule that a new combination of known elements which produces a new and beneficial result is invention. Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177."

It is also shown that this article met with popular success and wide demand. It was advertised in the catalogue of the defendant and is shown to be on display in stores in various cities of the country. The courts definitely recognize commercial success where the question is a close one and such success has been given weight in tipping the scales of a judgment toward patentability. Jungerson v. Ostby and Barton Co. et al., 335 U.S. 560, 69 S.Ct. 269, decided January 3, 1949; Goodyear

452

Tire and Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721.

■ The Court feels that the letters patent should be given weight. It is proper to consider that fact as making a prima facie case in favor of the patent. Palmer v. Corning, 156 U.S. 342, 15 S.Ct. 381, 39 L.Ed. 445.

■ I am of the opinion that the letters patent were properly issued and the plaintiff's claim to invention is borne out by the record.

The question of no interference or infringement is much simpler.

■ It is established by proof that no such article was even on the market until plaintiff's push cart appeared. A reading of the claims describes the push cart sold by the defendant. Claims must be read and construed in the light of the specifications and liberally interpreted so as not to destroy the right of the inventor in the substance of his invention. Westinghouse Electric & Manufacturing Co. v. Quackenbush, 6 Cir., 53 F.2d 632; Aluminum Co. of America v. Thompson Products, Inc., 6 Cir., 122 F.2d 796.

[8, 9] The defendant's cart is constructed of wire and has a slightly different axle arrangement. The difference, however, is not sufficient, in my judgment, to take the case out of the rule laid down in Grant Paper Box Co. v. Russell Box Co., 1 Cir., 154 F.2d 729, certiorari denied, 329 U.S. 741, 67 S.Ct. 79, 91 L.Ed. 639, where it was held that if the inventor's claim is broad enough he is not confined to that method which he thought best to claim for the practice of his invention, but may claim infringement if another uses the principle and appropriates the substance of his invention.

As stated in that case, [154 F.2d 731] "a patentee is not necessarily limited to illustrative specifications". The patent states that different material may be used without departing from the scope of the invention.

Innumerable cases could be cited both for and against the patentees' claims of invention and infringement, but this like most any other case must stand on its own particular facts and circumstances. To strike down the patent or deny the claim of infringement would be essentially unfair and unjust. The idea which produced a most useful article had its inception in the mind of this houswife who had a need for just such a helper in her daily tasks. Small living quarters prompted conservation of space. Folding it up and putting it away was not known to the art, in so far as the record shows. The materials of which it was made were the best that time, effort, trial and shortages because of war permitted and directed to be used.

In modern times the idea of a push cart from the market to the home or a car parked at some distant point is almost revolutionary as a solution to an acute housewife problem of carrying groceries which she may be physically unable to carry. The car parking problem in cities and town is one which has given great concern to officials and business leaders and has provoked much thought. In many places it is impossible to park near the shopping center and business is falling off in those centers with a consequent danger of ultimate destruction of value to businesses and the very valuable business property in which they are carried on. The item in suit in one sense may be a contributing factor to preserve these values by enabling the shopper to patronize the established business centers rather than the rapidly growing suburban shopping districts where parking space is advertised as an attraction.

Think of the case of a housewife with one or more small children, an aged woman, or one in poor health carrying several pounds of groceries daily from a store to an automobile three or four blocks away. If the idea of a collapsible box on wheels that can be snugly laid in a car and upon arrival home be kept in space not much larger than that necessary for an umbrella is not a worthwhile and patentable idea, nothing is. In many respects with the complexities of modern living conditions in crowded urban areas, a little marketing cart of this kind is more important than luxury limousines, golf courses or swim-

ming pools. It is not too much of an overstatement to attribute to them an important place in that domestic tranquility which is so necessary to our national existence. I am much impressed with the idea which this plaintiff had. Simple though it was, it had not been given the public before. It is invention in its best sense. She should not be deprived of the fruits of her initiative.

A picture of the background and development of the idea is best expressed by the plaintiff herself, an excellent witness:

"Q. Will you tell the Court in your own language the circumstances under which you made the invention of the shopping cart which is shown in this patent? A. On the 4th of July, 1940, I went to the delicatessen for some groceries that possibly I hadn't picked up during the week, that I really needed. And I took a paper bag with handles with me to the store. When I came home, I unpacked those groceries. I folded up the bag and I hung it on the kitchen door knob. And I thought how wonderful it would be if I had something with wheels on it that would fold up like that, that I could hang on the door knob or behind the door or put it even under the bed if I had to, because there were five of us living in four rooms and we didn't have any place to put one of those shopping carts that didn't fold up. So, when I went back to work— I don't remember whether it was the next day, but it was sometime during the week —I told Mr. Ruff, my employer, about it and he thought it was a very good idea. So, he said, 'can't you tell me how it would look'. I don't have a mechanical sort of mind, but I could see in my mind's eye how that would fold, so I told him about it. So, he drew lines and I drew lines and we worked on that idea every moment we could spare. Many times it was after work—at night—I would come home and get the dinner for my family and I would come back and work on that idea with him. In the meantime we had the war and everybody was rushing around. Employees were quitting and we both had to work overtime. All of our available time then was after supper—working on that

idea. By December, 1941, we did have a very good—what I thought—a paper—a chipboard model of that part together.

"But the big point that we were trying to bring out was the fact that that bottom would go up inside and the sides would collapse so that it could fold flat and we could store it somewhere for people like myself who just didn't have any room. We finally got that together after much experimenting with it.

\* \* \* \* \* \*

"Q. Will you describe the model that you made in 1942? A. Well, we made that one of masonite and plywood. We made more than one—and it was a very good one. Mr. Ruff and I, of course, were working with very crude tools. We had to use a hammer, in other words, and a hinge that wasn't exactly right; rivets that wouldn't exactly fit and we were doing the very best we could with it. And in the meantime I was writing everyone I ever heard of or could find in the telephone book. I went to the Chamber of Commerce. I went all through the Bottoms— I even came over on this side of the river and visited several plants over here to see if they could help us, but we were at war and nobody could do anything. So, finally, I wrote the War Production Board and I explained to them what I was trying to do to help those families, who like myself—husbands were then gone—they had no cars—gasoline was rationed—and I told them that I thought I was really contributing something to the war effort to have a cart like that, and they thought so, too. So, they granted me a priority to get hinges, and we actually got those hinges from the Kohstal Hardware at St. Bernard—two hundred dozen pair. Then they tried to help us find the rivets. That was another worry grind—going from place to place trying to find someone who could get us some rivets. I contacted different merchants and people who I thought could help us in the Carew Tower —some of them were in the Union Central Building. I called them up over the telephone and then I went back to the Chamber of Commerce. I wrote other cities' Chamber of Commerce. And all

those things tended to hold us back. Then after we found we could get the rivets, then we couldn't get any material. So, finally we did get three hundred carts made up by the Artyle Industries of Reading Road. Then we had the masonite—we had the rivets—we had the hinges."

The whole matter seems to be summed up by the Supreme Court in Expanded Metal Company v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 655, 53 L.Ed. 1034:

"It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. The fact that the invention seems simple after it is made does not determine the question; if this were the rule, many of the most beneficial patents would be stricken down. It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor. There is nothing in the prior art that suggests the combined operation of the Golding patent in suit. It is perfectly well settled that a new combination of elements, old in themselves, but which produce a new and useful result, entitles the inventor to the protection of a patent. Webster Loom Co. v. Higgins, 105 U.S. 580-591, 26 L.Ed. 1177, 1181."

The fourth and final defense is hard to understand in the light of the record. The defendant claims that although the patent was issued to the plaintiff and Arthur G. Ruff, there is nothing to establish Ruff's participation or contribution to the idea and the patent is therefore invalid as having been issued to one who was not entitled to be recognized as the inventor.

The evidence is to the effect that many hours were spent on this invention by both Ruff and the plaintiff and that its ultimate make and design were the result of exchange of ideas and cooperation in producing the article. Vrooman et al. v. Penhollow et al., 6 Cir., 179 F. 296.

I am of the opinion that the prayer of the plaintiff's complaint should be granted. Orders in conformity with this opinion should be submitted.