UNION SWITCH & SIGNAL CO. v. GENERAL RY. SIGNAL CO. (two cases).

GENERAL RY. SIGNAL CO. et al. v. LONG ISLAND RY. CO.

(Circuit Court, S. D. New York.  May 27, 1910.)

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—BLOCK SIGNALING SYSTEM
FOR ELECTRIC RAILWAYS.

The Struble patents, No. 819,322 and No. 819,323, for automatic block signaling systems for electric railways, so far as relates to the generic claims for a system using a direct current for operating the car motors and an alternating current for energizing the signal relays, were not anticipated and disclose patentable invention; nor are they invalid because of the new matter introduced into the applications by amendment in the Patent Office which was merely to more clearly and specifically describe the invention.  As to the specific claims covering as a specific form of the generic invention what is termed the "two-rail return" system, Struble is entitled to priority of invention over Young, to whom patents Nos. 757,537, 762,370, 815,890, and 815,891 were issued on later applications.  The Struble patents also *held* infringed by the system of the Young patents.

[Ed. Note.—Amendment of application, see note to Cleveland Foundry Co. v. Detroit Vapor Stove Co., 68 ·C. C. A. 239.]

In Equity.  Suits by the Union Switch & Signal Company against the General Railway Signal Company, two suits, and by the General Railway Signal Company and Samuel Marsh Young against the Long Island Railway Company.  Decrees for complainant in the first two suits, and for defendant in the last suit.

Gifford & Bull (Geo. E. Cruse and Livingston Gifford, of counsel), for the Union Switch & Signal Company and the Long Island Railway Company.

Clifton V. Edwards (Lawrence K. Sager and Thomas Howe, of counsel), for the General Railway Signal Company and another.

RAY, District Judge.  The first two suits are for alleged infringement of United States letters patent No. 819,322 and No. 819,323, issued to Jacob B. Struble, while the third suit pending in the Eastern District of New York, but ordered to a final hearing by Judge Lacombe in the Southern District with the other suits, is for alleged infringement of the Young patents, No. 757,537, No. 762,370, No. 815,890, and No. 815,891.  For convenience, the Union Switch & Signal Company will be referred to as the "Union Company."  It owns the Struble patents.  For convenience the General Railway Signal Company will be referred to as the General Company.  The General Company is the sole licensee of the Young patents.  The Union Company sues the General Company on the signaling installation made by it on the New York Central Railroad Company in its electric zone, while the General Company sues the Long Island Company because of its use of its signaling system made by the Union Company on the electrified part of its railroad.  The Union Company defends the Long Island Company.

The invention described and claimed in the two Struble patents relates to automatic block signaling on electric railways.  The Young pat-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ents relate to the same subject. The Union Company contends: That in Struble No. 819,322 application, filed November 16, 1901, it has claims for a generic invention, the distinctive current and distinguishing apparatus idea of means as explained by its expert, Mr. Waterman, viz., claims 4, 11, 12, 13, 18, 19, 20, 21, and claim 22 for the specific invention, viz., the use with the generic invention of inductive resistances between the blocks, enabling the propulsion current to return by both rails. That Struble No. 819,323 application, filed March 12, 1902, has the generic invention in claims 1, 9, 10, 15, 31, and the specific in claims 19, 20, 22, 32, and 33. That Young does not have claims for the generic invention except in combination with the specific invention, but does for the specific, viz., in No. 762,370, application, filed January 19, 1903, claims 6 and 10; in No. 815,890, application filed February 21, 1903, claims 18 to 24, inclusive; in No. 815,891, application filed April 25, 1903, claims 2 and 3; in No. 757,537, application filed November 6, 1903, claims 1 to 8, inclusive, and claims 10 and 11. The Union Company claims that Struble was and is the pioneer in the matter of block signaling on electric railways; that he was the first to provide a system of electric block signaling on electric railroads; that he was the first to provide such a system wherein interference between the signaling and power circuits was prevented, and that he accomplished this by using a current for signaling which was different from the car propulsion current; that is, by using a direct current for operating the car motors and an alternating current for energizing the signal relays. The Union Company contends that no prior patent or publication shows this, and that, as the claims of the Struble patent do, the fact of pioneership is established.

The defendant, the General Company, insists that the Struble patents are void for want of patentable novelty, that defendant does not infringe, and that during the pendency of the applications the claims were unwarrantably amended by including new matter. The defendant says that these patents relate simply to the application of the ordinary block signaling system then in common use on steam railways to an electric railway system; that is, that the patents in suit merely add or apply the old block signaling system to the electric railway without making any changes of adaptation or securing any new and different results and refers to several prior patents which it claims show this. The defendant says there was "no invention involved in adding Schreuder, Roome, and Spang systems to an electric railway"; (2) "the Struble patents are anticipated"; (3) "defendant does not infringe"; and (4) that the patents in suit contain new matter not disclosed in the original application, and that, while an application for a patent and the claims may be amended, under no circumstances can the application be amended into a new or a different invention than that first claimed. The defendant insists that the new matters introduced into the Struble applications were not only not disclosed in the original application, but were and are directly contradictory thereto. Also, that the rights of Stillwell and of Young accrued before Struble made either of the claims upon which suit is brought.

The following claims of Struble, No. 819,322, dated May 1, 1906, on application filed November 16, 1901, are in issue, viz., 4, 11, 12, 13, 18, 19, 20, 21, and 22, and they read as follows:

"4. In a signaling system, the combination of a closed track-circuit, an alternating-current supply therefor, a signal and means to control the operation of said signal, said means responding to the absence or presence of the alternating current in the track-circuit and not responding to continuous or direct currents traversing said track-circuit in its control of the signal. * * *

"11. In a signaling system for use on railways employing an electric current as a motive power and the track as a return for the electric current, the combination of a circuit which includes portions of both rails, an alternating-current supply for such circuit, and a translating device responsive to the presence or absence in it of the alternating current in said track-circuit to control a signal and not responsive to the motive-power current or continuous or direct currents in said circuit in its control of a signal.

"12. In a signaling system for use on railways employing a direct current as a motive power and the track as a return for the direct current, the combination of a circuit which includes portions of both rails, an alternating-current supply for such circuit, and a translating device responding to the presence or absence in it of alternating current in said circuit in its control of a signal and not responding to continuous or direct currents in said circuit in its control of a signal.

"13. In a signaling system the combination of a track-circuit, a constant source of alternating-current supply therefor, a signal, and means to control the operation of said signal, said means responding to the absence or presence of the alternating current in the track-circuit and not responding to continuous or direct currents traversing said track-circuit in its control of the signal. * * *

"18. In combination, a source of electric energy, a distribution-circuit for said source of energy, motor vehicles operated from said source of energy, a number of circuits electrically independent of each other for controlling signaling devices supplied with current differing in character from the current supplied from the other source of energy, signaling devices, and means carried by a vehicle for electrically isolating a signal when the vehicle moves into one of said independent circuits.

"19. A signaling system for electric railways employing the track as a return for the car-propulsion current, having in combination a number of circuits electrically independent and each formed in part by the track, a source of current for each circuit, a translating device for each circuit responsive to control a signaling device to the current intended for its operation and not to the propulsion-current, and the signaling devices.

"20. In an electric-railway system, a source of power-current, vehicles operated thereby, a power-circuit comprising two conductors extending from the power-current source to the cars, one of which is formed by the track, a signal-circuit of which the track forms both sides, a source of current for said signal devices connected to both rails of the track, and signal devices completing such circuit.

"21. In an electric-railway system, a source of power-current of one character, vehicles operated thereby, a circuit for said power-current comprising two conductors with which the cars make moving contact, one of which is formed by the track, a signal-circuit of which the rails of the track forms both sides, a source of current for said signal-circuit furnishing current of a different character and connected to both rails, and signal devices completing such signal-circuit.

"22. In an electric-railway system, a source of power-current, a power-circuit in which the track forms one side and conducts current in the same direction, signaling-circuits formed by the track in which the two rails conduct current in opposite directions consisting of a series of rail-sections having adjacent ends electrically separated from each other and inductive resistances connecting said adjacent ends and forming a path from section to section for the power-currents."

The following claims of Struble, No. 819,323, dated May 1, 1906, on application filed March 12, 1902, are in issue, viz., 1, 9, 10, 15, 19, 20, 22, 31, 32, and 33. They read as follows:

"1. A railway signaling system, having in combination a source of alternating current, a track-circuit in circuit with the source of alternating current, a reactance-coil connected across the track-rails of the track-circuit, and a translating mechanism operative to control a railway-signal by an alternating current in the track-circuit. * * *

"9. A track-circuit for railway signaling purposes comprising an alternating-current supply, a translating mechanism and a reactance coil.

"10. In a signaling system, the combination with a closed track-circuit including a source of alternating-current supply, a reactance-coil and a translating mechanism, of a signal, and a circuit for said signal which is controlled by said translating mechanism. * * *

"15. A closed track-circuit for railway signaling system comprising a source of alternating current located at one end of the track-circuit, a translating mechanism located at the other end of the track-circuit and a reactance-coil. * * *

"19. In combination with a railway the rails of which are employed as a return for direct current employed for the motor of cars traveling along the railway, a signaling system, said system comprising a series of track-circuits, an alternating-signaling current generator, means for supplying alternating-signaling current to said track-circuits from the alternating-signaling current generator, and means for limiting the effect of the alternating-signaling current to the track-circuits, but permitting the direct current to pass from the track-rails of one track-circuit to the track-rails of another track-circuit.

"20. In combination with a railway the rails of which are employed as a return for direct current employed for the motors of cars traveling along the railway, a direct-current generator a feed-conductor extending along the line of railway, and a signaling system, said system comprising a series of track-circuits, an alternating-signaling current generator, means for supplying alternating signaling current to said track-circuits from the alternating-signaling current generator, and means for limiting the effect of the alternating-signaling current to the track-circuits, but permitting the direct current to pass from the track-rails from one track-circuit to the track-rails of another track-circuit. * * *

"22. In combination with a railway the rails of which are employed as a return or ground for the propulsion-current for the car-motors, a signaling system, said system comprising track-circuits, a translating mechanism and a source of alternating-signaling current for each track-circuit and means for limiting the effect of the alternating-signaling current to the track-circuits, but permitting the propulsion-current to flow from the rails of one track-circuit to the rails of another track-circuit. * * *

"31. In combination, two sources of electric energy, a distribution-circuit for each source of energy, motor-vehicles operated from one of said sources of energy, a number of circuits electrically independent of each other for controlling signaling devices and supplied with current from the other source of energy, and signaling devices.

"32. In a signaling system for railways the trackway of which is divided to form block-sections, a signaling-circuit for each block, a source of alternating signaling-current for each of said signaling-circuits, a translating mechanism for each signaling-circuit, and reactance-coils connected across the rails of the block-sections.

"33. In an electric railway system, a source of power-current of one character, vehicles operated thereby, a circuit for said power-current comprising two conductors with which the car makes moving contact, one of which is formed by the track, independent signal-circuits in each of which the rails of the track, form both sides, a source of current for said signal-circuit furnishing current of a different character and connected to both rails, a signal device completing each signal-circuit, and reactance-coils connected across the track-rails of the signal-circuits."

These may be conveniently referred to as the first and second Struble patents, although Struble had another patent No. 590,600, dated September 28, 1897, application filed May 20, 1897, which is claimed to anticipate the claims of the Struble patents in suit. It will be referred to by its number. This old Struble patent, No. 590,600, says:

"The invention described herein relates to certain improvements in signaling for electric railways, and has for its object the employment of signal-controlling circuits and relays so constructed and arranged as to prevent the currents used for operating the motors from interfering with the proper operation of the signals. In signaling for steam railways the track is divided into a series of blocks or sections, one or both rails of each block or section being insulated from the rail or rails of the adjoining sections. The rails of each section are connected at one end to the poles of a suitable battery and at the opposite end to the poles of any ordinary relay whose armature forms part of a signal controlling circuit. As the direction of flow of current through the relays heretofore employed is immaterial as regards the energizing of the latter, it is apparent that when such system is applied to electric railways a leakage of dynamo-current might set the signal to clear position when a car is on the section controlled by such signal.

"The present invention consists in the employment of a polarized relay so connected to the rail-sections that when energized by any current than that from the track-battery its armature will be so shifted as to cause the setting of the signal to danger. * * * In the practice of my invention the generator, A, has one pole, as the positive, connected to the trolley main feed-wire or third rail, 1, in accordance with the system employed, and the negative pole connected to the return rail 2, which in the form or arrangement shown in Fig. 1 is continuous or unbroken. The other rail is divided into a series of insulated sections, 3, 3a, 3b, etc. Each rail section, 3, 3a, 3b, etc., is connected at or near its end to one pole of a battery, BB'; while the opposite pole of the latter is connected to the rail. The batteries are so connected to the rail of each section that the current will flow through the track-relays in the opposite direction to that of the generator, A. * * * Any suitable form of battery or generator may be used in the signal circuits, but it is preferred to connect one branch of the signal-circuits to the main feed or trolley wire, or third rail, and the other branch to the return rail so as to employ a portion of the current from the generator, A, for operating the signals. * * * With the currents flowing in reverse directions it will be readily understood that when a car enters upon a section, as III its battery, B2, will be short circuited, and the armature, 5, of the relay, 4b, will be moved by gravity or a spring from the stop, 6, thereby breaking the signal circuit and sending the signal to danger."

The Union Company says that the first work of closed track-circuit signaling on electric railways was done by it in 1900–01 on the Boston Elevated Railway under this' last mentioned patent and under the direction of Struble and employed what it terms the "all-direct current idea of means for the reason there was a direct current for the signaling current and a direct current for the car propulsion current." Waterman (plaintiff's expert) says of it:

"Struble's Boston Railway system was based on a definite and positive direction of flow of the propulsion current in the rails and a signal current, which was also a direct current applied to flow in an opposite direction in the rails, and hence was limited to special cases where uniform direction of flow of the propulsion current could be secured."

The complainant (Union Company) says that the art rested here until Struble made the next advance step by introducing into the art the "distinctive current idea of means" shown by the patents in suit, in

which an alternating current, differing in character from the direct current used for propulsion purposes, was employed in the track signaling circuit. This is what the complainant says is the generic invention of the patents and that it solves the problem of applying the closed track circuit system of signaling to electric railways, and that this idea of means involves a distinguishing apparatus in its embodiment, and this irrespective of whether one or both track rails are used to return the car propulsion current; that the specific two-rail return invention in all its forms is one of the advantages growing out of the generic invention, and that, because of this distinctive current idea of means, it is possible to retain the ordinary two-rail return by the use of "reactances" in various locations on the track way. Waterman says:

"The fundamental idea of means upon which the arrangements of the patents in suit are made may properly be designated for brevity as the distinctive current idea of means, since the fundamental conception was the application to the rails of a signal current of distinctive characteristics from that necessarily existent in the rails for purposes of propulsion."

This distinctive current idea of means prominent and plain in the first and second Struble patents, those in suit, is absent from the first Struble patent, No. 590,600. The Struble patents in suit call for the alternating current for signaling purposes. In the old Struble patent, No. 590,600, the signal current passed in one direction, while the propulsion current passed in the opposite direction. Both were of the same character, and, if the one current would operate the signal apparatus, the other would, of course, if by any means it flowed thereto or therethrough. This system practically required a constant direction of flow of the propulsion current in the rails, but the flow of current in the rails of electric railways is not ordinarily in one direction only. It follows that such a system was not of universal application in electric railroads. It was good and sufficient so far as it went, and reasonably safe and reliable under certain conditions. It could be applied, and was applied, in an elevated electric railway. It would not do on surface roads. It could be used only where uniform direction of flow of the propulsion current could be secured. It seems to me that patentable invention is disclosed, having in view the prior art which I have examined with considerable care. Struble provides means for carrying his idea into practical effect, and its great utility has been practically demonstrated. I think the evidence and prior art discloses that both direct and alternating currents were in use for signaling on steam roads prior to Struble, but signaling on steam roads was quite a different problem from signaling on electric railroads. A train operated or propelled by steam entering on a section of road having an electric signal circuit and apparatus is quite different from a train of cars, one or more, propelled by a powerful direct current of electricity entering on a section of road having the same electric signal circuit and apparatus. In my judgment to have attempted the experiment of doing the latter and relying on the proper operation of the electric signal for safety would have been foolhardy. The problem presented demanded far more than the work of the mechanic skilled in the art, and it seems clear that Struble is en-

titled to the credit of solving the problem for all conditions and circumstances. The Spang, the Roome, and the Schreuder patents were for steam roads. I think each describes an alternating current for the track circuit, but they had no apparatus capable of distinguishing between a direct and an alternating current. Either current could be used. In Roome there was a single source for the track circuits with a transmission system, not an individual or distinct source for each track circuit. I do not find it necessary to discuss or describe the open track circuit system and the closed track, circuit system. What I decide in this aspect of the case is that the claims of the patents of Struble in suit for the generic invention are valid, and that patentable invention is disclosed. As to the new matter, it seems to me that the changes were to make the specifications and the claims plain and specific, and describe the invention clearly. If a claimant has failed to fully and clearly describe his invention and make claims in proper form clothed in suitable language, it is not unusual to reject with suggestions of amendments. Of course, a claimant cannot file a claim for one invention, and then by amendment claim another and distinct invention. If it be true that a system of automatic electric signaling has been devised for electric roads and put in successful operation, and this system is such that the direct propulsion current by leakage or going astray does not seriously interfere with the signals, or their operation, or operative effectiveness, we have a most valuable discovery and invention, one the value of which cannot be overestimated. I think this has been done, and that Struble is entitled to the credit. I do not find it anticipated, or that by taking the suggestions of the prior art and bringing them together and applying them to electric railway signaling Struble was doing the work of the mechanic skilled in this art. It was an important field and an open one. It was not an obvious thing to do. I am clear that the inventive faculties of many were exercised in the effort, but that those of Struble accomplished the desired object.

### Specific Invention and Young Patents.

Coming to the specific invention as found in claim 22 of Struble, No. 819,322, and claims 19, 20, 22 and 23 of Struble, No. 819,323, we find that what is termed the "two-rail return" is not claimed in and of itself, but rather as a limitation or specific form of the so-called generic distinctive-current heretofore mentioned. I think Young in his patents, those set out in the Young patents in suit of which the General Company is the sole licensee, makes the same claim. The Union Company claims it under the Struble patents and the General Company as sole licensee and Samuel Marsh Young as patentee and owner claims it under the Young patents in suit. Each party concedes invention, but "priority of invention" is the issue here.

I have already mentioned the claims of the Young patents in issue here. The Young patent, No. 757,537, dated April 19, 1904, application filed November 6, 1903, says:

"My invention relates to a method of automatically operating block-signals on an electric railway."

Also:

"Considered in its broadest sense, my invention contemplates the employ-
ment, first, of two sources of electric energy differing in character, the use of
the current from one of said sources to effect the movement of the vehicles
upon the railway and the current from the other of said sources to actuate
the signaling devices in the respective blocks; second, the employment of the
traffic-rails as a common return for both currents used; third, the employ-
ment of means for segregating the two currents between the devices designed
to be operated thereby; fourth, the employment of reactance-bonds, condens-
ers, and the like as said segregating means; fifth, the employment of the ve-
hicles upon the railway as the means for short-circuiting the signaling devi-
ces in a block when a vehicle moves into and during the time that it is with-
in the block."

## The claims of this patent in issue read as follows:

"1. A method of operating signals upon an electric railway where the sig-
nals are adapted to be controlled by the movement of the motor-vehicles in
said system, which consists in impressing an alternating current upon the con-
ductors which separately form return-paths for the power-circuit, normally
transmitting such alternating current through the signaling devices employed,
and shunting said alternating current around successive signaling devices.

"2. A method of operating signals upon an electric railway where the sig-
nals are adapted to be controlled by the motor-vehicles in said system and
where the traffic-rails separately form return-paths for the power-circuit and
are divided into blocks, which consists in impressing an alternating current
upon the traffic-rails, normally transmitting such alternating current through
the signaling devices in all of the blocks and shunting said alternating cur-
rent around a signaling device in a block when a motor-vehicle moves into
a block.

"3. A method of operating signals upon an electric railway, which consists
in creating a difference of potential between the traffic-rails of the system
which separately form return-paths for the power-circuit and over which a
current differing in character is flowing, actuating signaling devices by the
current due to such difference in potential and shunting said current around
certain of said signaling devices through the instrumentality of apparatus ac-
tuated by the power-current transmitted.

"4. A method of operating signals upon an electric railway, which consists
in impressing a current upon conductors which separately form return-paths
for the power-current and through which a power-current differing in char-
acter is flowing, segregating said currents, actuating signaling devices by said
impressed current and shunting said impressed current around certain of said
signaling devices through the instrumentality of apparatus actuated by the
power-current.

"5. A method of operating signals upon an electric railway, which consists
in creating a difference of potential between the opposite rails of each block
of a railway, and over each of which rails a current differing in character
from that due to the created difference of potential is separately flowing, em-
ploying the current due to such difference of potential for actuating mechan-
ism for carrying signals to the clear position, and in short-circuiting such cur-
rent in a block by the movement of a car into a block, whereby the signal will
automatically be moved to the clear position.

"6. A method of operating motor-vehicles and signals upon an electric rail-
way, which consists in generating two currents differing in character, trans-
mitting said currents to a distribution-circuit, wherein the traffic-rails are di-
vided into blocks and separately form return-paths for the power-current, seg-
regating such currents by means of apparatus located in the blocks, employing
one of such currents to operate the motor-vehicles upon the railway, the other
to operate the signaling devices, and in short-circuiting the signaling devices
of a block as the motor-vehicle moves into a block.

"7. A method of operating motor-vehicles and signals upon an electric rail-
way, which consists in generating two currents differing in character, trans-
mitting such currents to a distribution-circuit, wherein the rails are divided

into blocks and separately form return-paths for the power-current, segregating such currents by means of apparatus located in the blocks, employing one of said currents to operate the motor-vehicles upon the railway, and the other of said currents to create a difference of potential between the opposite rails of a block to actuate the signaling devices in the block, and in short-circuiting such signaling devices when a motor-vehicle moves into a block.

"8. A method of operating motor-vehicles and signals upon an electric railway, which consists in generating two currents differing in character, transmitting said currents to a distributing-circuit, wherein the rails are divided into blocks and each rail separately serves as a return-path for the power-currents, segregating said currents by means of induction apparatus included within the blocks, using one current to operate the motor-vehicles, the other to actuate the signaling devices in the blocks, and in short-circuiting said signaling devices as a motor-vehicle moves into a block.  *  *  *

"10. A method of operating motor-vehicles and signals upon an electric railway, which consists in generating two currents differing in character, transmitting such currents to the rails of a railway, causing one of said currents to divide and separately flow through each of the rails of said railway as the return-path for the power-circuit, separating the other of said currents and segregating it between different blocks of the railway, using one of said currents to operate motor-vehicles upon the railway, and the segregated currents to actuate signaling devices in the blocks of the railway.

"11. A method of operating motor-vehicles and signals upon an electric railway, which consists in generating two currents, transmitting said currents to a distribution-circuit, wherein the traffic-rails are divided into blocks, form the return-path for the power-current, and are rendered electrically independent of each other so far as relates to one of the currents transmitted by means of reactance devices interposed between the blocks, using one of said currents to operate the motor-vehicles upon the railway, dividing the other current between the blocks, limiting its action to individual blocks and using such current to actuate a signaling device in each block, and employing the motor-vehicles to short-circuit the signaling devices as they enter a block."

In Young patent, No. 762,370, dated June 14, 1904; application filed January, 1903, he says:

"Described in other terms, my invention consists, broadly, in providing means for operating an electric-railway system by a direct current, as is usual, and signaling or other similar devices by an alternating current and utilizing the movement of the cars actuated by the direct current to control the movements of the devices actuated by the alternating current.

"My improved signaling system may also be used for other purposes, and I wish it understood that I consider myself to be the first to suggest and show how an alternating current may be impressed upon a direct current and transmitted through the conductors upon which a direct current is flowing and utilized through devices actuated by the direct current to actuate mechanism for signaling or otherwise."

The claims in issue, 6 and 10, read as follows:

"6. A signaling system comprising two sources of current differing in character, a system of distributing-conductors over which both currents are transmitted and formed in part by both rails of a railway, a motor-vehicle on such rails, a series of signaling-circuits over which only one of such currents is transmitted, signaling devices in said signaling-circuits, means for maintaining the electric separation of the two currents and confining their individual action to certain apparatus; one current to the operation of the motor-vehicle and the other to the operation of the signals; together with means carried by the vehicle for cutting a signaling device out of circuit.  *  *  *

"10. A signaling system comprising two sources of energy differing in character, a working circuit of which the rails form a part, and over which the currents differing in character are transmitted, means for dividing said working circuit into blocks, a signaling device in each block, a moving vehicle, means for differentiating the currents differing in character between the sig-

naling devices and the moving vehicle, and means for cutting a signal device out of circuit as a vehicle moves into a block."

In Young patent, No. 815,890, dated March 20, 1906, application filed February 21, 1903, divided and this application filed October 18, 1904, he says:

"Considered broadly, my improved system involves the employment of a power-current conveyed along the railway through a feeder-conductor and back to the power-generator through each rail separately as the means for operating the cars upon the railway, an alternating current segregated between the block-sections as the means for normally operating the signaling devices, and in utilizing the movement of the cars into and while in a block-section to shunt the alternating current around the signaling device of such block-section."

The claims in issue, 18 and 20 to 24, inclusive, read as follows:

"18. A system of automatic signaling comprising a source of power-current, a source of alternating signaling-current, a trackway divided into block-sections with each rail arranged to serve as a separate and independent return-path for the power-current, means for exciting an alternating difference of potential between the rails of each block-section, means for limiting the difference of potential excited in a block-section to that section, a signaling device in each block-section, and means controlled by the movements of the cars, which will control the movements of the signaling devices.  *  *  *

"20. A system of automatic signaling comprising a source of power-current, a source of alternating signaling-current, a trackway divided into block-sections with each rail arranged to serve as a separate and independent return-path for the power-current, an induction device interposed between the source of signaling-current and the rails of each block-section for exciting an alternating difference of potential between said rails, reactance devices for limiting the difference of potential excited in a block-section to that section, a signaling device in each block-section, and means controlled by the movements of the cars, which will control the movements of the signaling devices.

"21. A system of automatic signaling comprising a source of power-current, a source of alternating signaling-current, a trackway divided into block-sections with each rail arranged to serve as a separate and independent return-path for the power-current, means for exciting an alternating difference of potential between the rails of each block-section, means for limiting the difference of potential excited in a block-section to that section, a signaling device in each block-section, and an induction device interposed between the rails and the signaling device adapted to be controlled by the movements of the cars and which will control the movements of the signaling devices.

"22. A system of automatic signaling comprising a source of power-current, a source of alternating signaling-current, a trackway divided into block-sections with each rail arranged to serve as a separate and independent return-path for the power-current, means for exciting an alternating difference of potential between the rails of each block-section, means interposed between the blocks which will freely permit the passage of the whole power-current back to the source of power-current but limit the difference of potential between the rails of a block-section to that section, a signaling device in each block-section, and means controlled by the movements of the cars, which will control the movements of the signaling devices.

"23. A system of automatic signaling comprising a source of power-current, a source of alternating signaling-current, a trackway divided into block-sections with each rail arranged to serve as a separate and independent return-path for the power-current, means for exciting an alternating difference of potential between the rails of each block-section, means interposed between the blocks which will freely permit the passage of the whole power-current back to the source of power-current, but limit the difference of potential between the rails of adjacent block-sections to the sections which at the time are unoccupied, a signaling device in each block-section, and means controlled by the movements of the cars, which will control the movements of the signaling devices

180 F.—30

"24. A system of automatic signaling comprising a source of power-current, a source of alternating signaling-current, a trackway divided into block-sections with each rail arranged to serve as a separate and independent return-path for the power-current, means for exciting an alternating difference of potential between the rails of each block-section, means which will permit the free passage of the power-current, but present high impedance to the passage of the alternating current from block-section to block-section, a signaling device in each block-section, and means controlled by the movements of the cars, which will control the movements of the signaling devices."

In Young patent, No. 815,891, dated March 20, 1906, application filed April 25, 1903, divided and this application filed October 18, 1904, he says:

"I will describe my invention as applied to a system employing a direct current for operating the car-motors and an alternating current for actuating the signaling devices, which system is intended as a modification of that described in my prior patents."

Claims 2 and 3, in issue, read as follows:

"2. A system of electrical distribution and signaling for railways, comprising two sources of electrical energy delivering currents differing in character, a system of conductors from each of said sources of energy, one of said systems of conductors electrically insulated from the current traversing the second system of conductors, and the second system of conductors having impressed upon its return-legs an alternating current, motor-cars driven from the second source of electricity, and signaling devices energized from the first source of electricity and adapted to be controlled by the movement of the motor-cars.

"3. A system of electrical distribution and signaling for railways, comprising two sources of electrical energy delivering currents different in character, a system of conductors from each of said sources of energy, one of said systems of conductors electrically insulated from the current traversing the second system of conductors, and the second system of conductors having impressed upon its return-legs a current different in character from that derived from the second source of electricity, motor-cars driven from the second source of electricity and signaling devices energized from the first source of electricity and adapted to be controlled by the movements of the motor-cars."

It is obvious that the claims of the Struble patents now being considered, but which were not issued until 1906, cover the same elements and combination described in the Young patents. The Young patents were issued first in 1904, but the Struble patents were first applied for. Now, it is presumed, until the contrary is shown, that the patent granted is for the invention claimed and described in the application therefor filed. Loom Company v. Higgins, 105 U. S. 580, 594, 26 L. Ed. 1177; Walker on Patents, § 190. There was an interference declared in the Patent Office between Struble and Young involving the very questions presented here. The examiner of interferences awarded priority of invention to Young, but this was reversed by the board of examiners in chief, and the decision of this board was affirmed by the commissioner. On appeal to the Court of Appeals, District of Columbia, this decision of the commissioner was affirmed. Samuel Marsh Young, Appellant, v. Jacob B. Struble, Respondent, Patent Appeal No. 597, opinion by Mr. Justice Van Orsdel, filed December 14, 1909 (34 App. D. C. 218). This thorough examination of the question of priority of invention as between Young and Struble by four tribunals, so to speak, examiner, board of examiners, commissioner and Court of Appeals, and the conclusion reached, while

not binding on this court, is entitled to great consideration and respect. I would not follow the judgment of the commissioner and the Court of Appeals did they not agree with my own judgment. I have carefully examined the authorities cited by the learned counsel for the General Company, the evidence, and the able argument presented, but am forced to the conclusion that the decision was right. While the opinion of Mr. Justice Van Orsdel does not embrace all that might be said, it covers all the salient and determining points and is quite conclusive.

The General Company says the interference is not relevant, but I fail to see why it is not. The General Company says: The two-rail system of the interference was not one with each rail carrying 50 per cent. of the current, and therefore having independent return rails. That the Young patents are limited to separate and independent return, each rail carrying approximately 50 per cent. of the current. That the interference was not between either of the Struble applications for patents, 819,322, and 819,323, and either of the Young applications for patents. That the application of Struble in interference was filed in 1904, and that "the interference involved different Young applications from those of the patents in suit." I do not see that Young limits his two-rail system to one where each rail must carry 50 per cent., or approximately 50 per cent., of the current. If he does, it is merely an improvement on (if patentable at all in view of Struble in case Struble was prior in the two-rail system) on Struble. If Struble was not first in this two-rail system applied to electric roads, Young was. If Struble was first and applied legally for a patent—that is, if his first application or amended application was good—it takes preference over Young, as the applications were ahead of Young's claims of invention. If Struble's claims are valid, they embrace the two-rail system for the return current, and, even if a patent to Young for an improvement insuring a return of approximately 50 per cent. of the current by each rail is valid, it is for an improvement merely, and does not justify the use of the two-rail system covered by Struble's patents. So we are turned back to the question of priority of invention. Now, what did the interference involve? The opinion of Mr. Justice Van Orsdel, after giving the prior art (steam roads), says:

"When the need for electrical signaling arose for use on electric railways, a different and more serious problem was presented. It was customary to utilize the rails as conductors for the return of the propulsion current. In adapting this system to electric railways, it was necessary, prior to the invention here in issue, to divide one of the rails into blocks insulated from each other, and confine the power current to the other rail, which was made electrically continuous. Thus only one rail could be used as a return conductor. This proved objectionable for many reasons, one of which being that, should the electrical connection formed by this single rail become broken at any point along the line, it would stop the operation of the entire road. To obviate this difficulty, what is known as the two-rail system was devised, in which an alternating current, differing in character from the direct current used for propulsion purposes, was employed in the track-signaling circuit. Inductive resistances, which would permit the direct or propulsion current to flow freely, but which would choke back the alternating or signaling current, were substituted for the insulation between the rails. By this means, it was possible to utilize both rails for the return of the track current to the generator. This latter system is the invention involved in this interference.

"The issue comprises 13 counts. Count 1 presents the invention in its broadest aspect, and reads as follows:

" '1. In an electric railway signaling system, employing a closed signal controlling track-circuit, a plurality of block sections, one rail being divided into insulating sections corresponding to the block sections, a signal for each block section operable by an alternating current, a source of alternating current for said signals, a source of direct current for propelling the railway cars, and means for permitting the direct current to pass from one insulated rail section to another and for preventing alternating current from passing from one insulated rail section to another.'

"Counts 2 to 6 and 10 to 12 are merely restatements of the same invention. Counts 8 and 9 contain the limitation that each rail separately serves as the return for the direct current, and counts 7 and 13 include reactance bonds connected across the rails. Count 7 is as follows:

" '7. In an electric railway signaling system employing a closed signal controlling track circuits, a plurality of block sections, one rail being divided into insulated sections corresponding to the block sections, a signal for each block section operable by an alternating current, a source of alternating current for said signals, a source of direct current for propelling the railway cars, means for permitting the direct current to pass from one insulated rail section to another and for preventing alternating current from passing from one insulated rail section to another, and one or more inductive bonds connecting the rails.'

"Appellant filed his application April 25, 1903; while appellee's application was not filed until March 4, 1904. The earliest date alleged by appellant for conception and disclosure of the invention is December, 1902. Appellee has introduced in evidence two applications, one filed on November 16, 1901, and the other on March 12, 1902, which he claims disclose, as originally filed, the invention here in issue; or, if not, it is disclosed by certain amendments filed in April, 1902. On the other hand, it is contended by appellant that these applications relate to the one-rail system, and neither before nor after amendment disclose the invention in controversy; and that, conceding that the amendments of April, 1902, do disclose the invention, such disclosure would constitute new matter, and therefore not properly made in these applications. The application of November, 1901, contained a fragmentary view (Fig. 3), showing the contiguous ends of a pair of rails with a helix connecting them and described as 'a detail view of the rail joint.' The only reference made to this figure in the specification, and which would suggest a two-rail system, is the following: 'As an alternating current is employed in the track-circuit, resistance 5° may be substituted for the insulation.' Whether this statement discloses the elements of the counts of the issue we need not discuss, for on April 8, 1902, the following amendment was filed, which was not considered by the examiner of interferences in awarding priority to appellant, and which was held by the majority of the board of examiners in chief and the commissioner, with whom we agree, to unquestionably describe the invention: 'As an alternating current is employed in the track-circuit provision may be made for utilizing both lines of rails as return conductors for the direct or motor current by connecting the insulated or electrically separated ends of the rail sections, 2, by inductive resistances, 5°, as shown in fig. 3. As is well known, these resistances will prevent the flow of alternating currents through them, but will not present any material resistance to the flow of direct currents.'

"The following claims also formed part of this amendment:

" '3. In an electric railway signaling system, the combination of a series of rail sections having adjacent ends insulated or electrically separated from each other, and inductive resistances connecting the rails of adjacent sections whereby alternating currents are confined to the track-circuits and the direct or motor-currents are permitted to flow from rail section to rail section.

" '4. In an electric railway signaling system, the combination of a series of rail sections having adjacent ends insulated or electrically separated from each other, said rail sections forming portions of track circuits, a source of alternating currents included in the track circuits, inductive resistances connecting adjacent ends of rail sections and forming a path from section to section for direct currents, and a source of direct currents having one pole connected to the lines of rails, substantially as set forth.'

"In the course of the proceedings in the Patent Office, the question of new matter was passed upon by three primary examiners, all of whom agreed that

the original specification and drawings warranted the amendments. * * * But counsel for appellant contends that this amendment should not be considered, for the reason that no evidence was presented by appellee to show that he conceived the subject-matter of the amendment prior to the filing of the November application. We are not impressed with this contention. The amendment was accompanied by a supplemental oath setting up that fact. Appellee's sworn statement furnishes prima facie proof of its truth, which must be overcome by evidence to the contrary. No such evidence appears in this record. * * * It must therefore be held that appellee has proven conception and disclosure of this invention at least as early as April, 1902, eight months prior to the date claimed by appellant. Whether or not these earlier applications, as contended for by counsel for appellee, and as found by the commissioners and board of examiners in chief, constitute a constructive reduction to practice of the invention in issue, we may pass without opinion. We have concluded that they fully establish conception and disclosure, and, if appellee was exercising due diligence between December, 1902, the time appellant entered the field, and March 4, 1904, appellee's filing date, he must prevail. During this period appellee was prosecuting the earlier applications, which contained claims to the subject-matter of this issue; and it must be held that he was justified in awaiting the final rulings of the Patent Office in order to determine the advisability of filing a separate application. But it is contended on behalf of appellant that appellee was not prosecuting these applications with diligence, in that he took no action between the date of the amendments, April 8, 1902, and January, 1903. This, we think, is not an unreasonable length of time in which to amend an application, especially in view of the fact that one year is allowed before an application is declared abandoned."

It seems clear, if the Court of Appeals was talking to the point involved, that the commissioner and court decided the question of priority of invention of this two-rail return system in combination with the use of the alternating current for signaling and direct current for propulsion both currents using the same rails, the one current not mixing, so to speak, with the other, and the use of a signal and signaling apparatus capable of distinguishing between the two currents and answering to the one and not to the other, etc., all in electrical signaling on electric railroads. The court points out the dates of filing by Struble and Young and also the amendments of Struble to his applications for his patents now in suit, and discusses and determines his right to make such amendments. I cannot read that opinion other than as deciding between Struble and Young that Struble was the first to invent, claim, etc., and that he had the right to make and file the amendments now challenged.

But the General Company contends that it has introduced evidence not before the Patent Office, Commissioner of Patents, and Court of Appeals, and that in the light of this evidence the decision of this court should be the other way. Reference is made to the Stillwell letter and the Westinghouse reply. It is quite true that the Stillwell letter of April 1, 1902, proposes the use of both rails for a return of the propulsion current, the use of an alternating current for signaling, and the use of inductive bonds. The letter has considerable to say about the bond. April 4, 1902, Osborne, of the Westinghouse Company, to whom the Stillwell letter was sent, wrote that he would put the matter in the hands of their engineers, and April 15th, wrote that Mr. Scott had been directed to fully investigate the scheme, and that a conference was had with a Mr. Schreader and other engineers of the Union Switch & Signal Company, but I find nothing that in-

volves Struble in this matter, or which indicates, much less proves, that he gained his inspiration or knowledge from the Stillwell letter. Really Osborne's letter of April 15th is not a declaration that a two-rail return system has been pronounced inoperative; but rather refers to the proposed bond for use in such a system for the uses desired. It is true that Struble's amendments closely followed the Stillwell letter, but this is far from proving that Struble saw the letter and made his amendments because thereof or of the information therein given or suggestions made. True it may have been so, but such a conclusion would be speculation. I do not see that it would serve any useful purpose for me to go into all the arguments, etc., relating to this part of the controversy. I have read all the evidence and all the briefs, additional briefs, and answering briefs, and, after long deliberation, have arrived at the conclusion stated above. The question of due diligence on the part of Struble in regard to his invention is involved. It seems to me that, in view of the importance of the matter, the necessity for experimentation, interferences, etc., that all diligence was exercised.

These being my conclusions, there will be a decree in favor of the Union Switch and Signal Company, complainant in the suits brought by it against the General Railway Signal Company, and in favor of the Long Island Railway Company in the suit brought against it by the General Company and Young. I think the successful party in each case should have costs. In view of the interests involved, and assuming the defeated parties will desire to take an appeal, the issue of an injunction will be suspended pending such appeal or appeals, provided same is taken within 30 days and prosecuted with diligence, but a suitable bond should be given to pay all costs and damages awarded by the final decree in case of affirmance, and suitable orders to that effect may be submitted with the proposed decrees. This will save formal applications.