49 CCPA

## Application of Constantin CHILOWSKY.
### Patent Appeal No. 6817.

United States Court of Customs
and Patent Appeals.
Aug. 20, 1962.

W. Saxton Seward, New York City
(Robert I. Dennison, Washington, D. C.,
of counsel), for appellant.

Clarence W. Moore, Washington, D. C.
(Joseph Schimmel, Washington, D. C., of
counsel), for the Commissioner of Pat-
ents.

Before WORLEY, Chief Judge, and
RICH and SMITH, Associate Judges,
and Judge WILLIAM H. KIRKPAT-
RICK.*

RICH, Judge.

Over 17 years ago, on December 20,
1944, Constantin Chilowsky filed patent
application Ser. No. 568,986, the appli-
cation at bar, for "Method and Apparatus
for Extraction and Utilization of the
Energy Resulting from Atomic Decompo-
sition of Uranium and its Compounds."
Over 6 years ago, on January 20, 1956,
this court, after a second oral argument,
reversed a decision of the Patent Office
Board of Appeals which held the claims
in this same application insufficient, in-
definite and based on an inoperative dis-
closure and remanded the case because
"the Patent Office tribunals have not suf-
ficiently explained the reasons for their
rejection." [1]

---

* United States Senior District Judge for
the Eastern District of Pennsylvania,
designated to participate in place of
Judge O'CONNELL, pursuant to provi-
sions of Section 294(d), Title 28, United
States Code.

1. In re Chilowsky, 229 F.2d 457, 43 CCPA
775. The basis for this court's reversal
and remand in the Chilowsky case was
that the Patent Office had not *specifically*
stated its grounds of rejection but in-
stead made a "blanket rejection based
on the comparatively recent development
of the art and the difficulty which has
been experienced in producing commer-
cial devices." It has now certainly
remedied that deficiency.

The instant appeal is from the November 30, 1960 decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 49–60,[2] the essence of which is:

> " * * * [I] that the disclosure is insufficient to enable one skilled in the art at the time of filing to construct an operative device, without in so doing carrying an undue burden of experimentation. * * * [II] that information needed to enable persons skilled in the art to construct and operate a nuclear reactor using applicant's broad proposals was not available at the time of filing, and that an undue amount of experimentation would be required to enable such persons to supply the necessary missing details to convert this disclosure to one capable of producing a useful result."

The issue in this case is primarily one of law. All claims on appeal are equally affected by it. The statutory basis for the rejection clearly includes the first paragraph of 35 U.S.C. § 112 and the last sentence of 35 U.S.C. § 132.[3] The initial portion of the examiner's rejection, designated "I" above, puts in issue all four requirements of paragraph 112, namely, that the specification shall contain, in such full, clear, concise and exact terms as to enable any person skilled in the art to which the invention pertains, or with which it is most nearly connected, to make and use it, a written description (1) of *the invention;* (2) the manner and process of making *the invention;* and (3) the manner and process of using *the invention;* and that (4) the best mode contemplated by the inventor of carrying out *his invention* shall be set forth. The second portion of the examiner's rejection, designated "II" above, puts in issue a fifth point, related to the first four, namely, the state of the knowledge of the art at the time of appellant's invention, which we shall assume to be his filing date.

■ What is the invention is, of course, determined by appellant's claims, read in the light of what his specification indicates to be the subject matter which he has invented. Two typical claims are:

> "52. A method of extracting heat from a neutron reaction which comprises: conducting said neutron reaction with a uranium fuel contained in a liquid metal selected from the group consisting of lead, radio-lead, bismuth, and alloys thereof and circulating at least a part of said uranium fuel contained in said liquid metal between a reaction zone and a heat exchange zone, thereby to extract heat from said liquid metal and said uranium fuel.

> "53. An apparatus for the extraction and utilization of the thermic energy resulting from atomic decomposition which comprises: (1) an atomic decomposition chamber adapted to contain a fuel liquid also

2. Claims 49–53, of which 52 and 53 are exemplary, appeared in this case by amendments dated August 26, 1957, and October 21, 1957, subsequent to the Examiner's Final Rejection of February 27, 1957. Claims 54–60 were inserted by amendment dated June 12, 1959, for the purpose of instituting an interference with claims 1, 2, 4, 5, 7, 9, and 11 of patent No. 2,875,143 issued February 24, 1959, on an application filed July 16, 1956, to D. K. Froman, assignor to the United States Atomic Energy Commission.

3. The first paragraph of 35 U.S.C. § 112 reads:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

The last sentence of 35 U.S.C. § 132 reads:

"No amendment shall introduce new matter into the disclosure of the invention."

910

serving as a heat transfer medium comprising (a) uranium and (b) a liquid metal selected from the group consisting of lead, radio-lead, bismuth and alloys thereof, and communicating with said atomic decomposition chamber, (2) a heat exchanger adapted to remove at least a portion of the heat generated in said atomic decomposition chamber by atomic decomposition, said heat being carried to said heat exchanger by said fuel liquid."

Simply stated, the instant invention[4] is direccted to method and apparatus for extracting and utilizing thermal energy resulting from nuclear fission carried out in a molten liquid metal medium. The method also includes circulating the liquid metal medium into or through a heat exchanger where the heat is extracted for use. Eleven drawing figures disclose several proposed embodiments of appellant's apparatus. Various ones of these embodiments have one, two, or four reaction chambers. The heat exchangers are so placed with respect to these reaction chambers that the liquid metal medium moves intermittently up and down, by the geyser-like force of its own boiling, with respect to a single heat exchanger, or back and forth through heat exchangers between two or more reaction chambers. One embodiment contemplates that the liquid metal medium will move continuously around and through a single heat exchanger being moved by an impeller through the same and a central reaction chamber.

Two paragraphs in appellant's specification discussing the aspects of his invention which are of particular concern to us are reproduced below and amplified in footnotes making additional references to the specification.

"According to the present invention, the active mass which can undergo atomic decomposition, formed substantially from uranium or its compounds and light elements, assuring formation of slow neutrons, is reduced to a state of very fine subdivision[5] and is suspended in a supporting liquid or is intimately mixed therewith. Such a supporting liquid can be preferably a liquid metal, having little capacity for absorbing neutrons; for instance, an alloy of lead and bismuth. It forms with the fine suspension a metallic liquid or a quasi-liquid, which will be hereinafter called 'special liquid'. The suspension can be formed, for instance, of uranium carbide with the possible addition of excess of carbon in the form of heavy carbides of other metals.[6]

"The process of transmission of heat of the atomic decomposition consists in that this 'special liquid', placed in a condition for atomic decomposition, is stabilized at a suit-

---

4. We note that appellant has disclosed various species of his invention. Pursuant to an examiner's requirement for election dated June 12, 1956, appellant, on December 12, 1956, made his election. Nothing in the record before us indicates whether at the time of appeal this requirement was still in effect or whether the claims are specific to one species of invention or generic. Accordingly, in discussing appellant's invention, we shall treat the claims as being generic and discuss only those aspects of the disclosure which relate to all of appellant's disclosed species.

5. The actual degree of subdivision is stated as being "of the order of .01 mm. to .001 mm. in size, but a finer division, if obtainable, would also be suitable."

6. Two proposed compositions of the "special liquid" are given; they are (percentages by weight):

| | |
|---|---|
| (1) Uranium carbide (UC$_2$) | 27% |
| Molybdenum di-carbide (MoC$_2$) | 6% |
| Supporting liquid (lead or radio-lead) | 67% |
| (2) Uranium (U) | 20% |
| Molybdenum di-carbide (MoC$_2$) | 15% |
| Supporting liquid | 65% |

As to the significance of these proportions, the specification further states (our emphasis):

The proportion of the molybdenum dicarbide *may vary* within a relatively wide range (for instance, from 0 to 12% in the first composition) *depending on* the total accumulated *amount* of the

able temperature [7] by small quantities of cadmium,[8] is very rapidly [9] heated by the atomic decomposition to this critical temperature and is then projected [10] * * * outside the narrow container where it was heated by the atomic decomposition into or through a larger container which forms at the same time a heat exchanger, much larger,[11] more efficient and convenient, in which exchanger will take place a transfer of the heat energy of the atomic decomposition accumulated in the 'special liquid', to another liquid or fluid [12] passing through the ex-

special liquid *and* the *ratio* by which this amount exceeds the minimum quantity (mass and concentration) necessary to start the atomic decomposition. As this ration [sic] is reduced toward unity the proportions of the ingredients become more critical.

The proportion of the suspended material in the *supporting liquid may likewise be varied* as a function both of the temperature to be reached and of the size of the suspended particles, the *range* normally being between 20% and 45% by weight of the total. The requirement that the "special liquid" must have a sufficient liquid mobility is a factor determining the upper limit of this range, and the provision of particles having a minimum size will tend to raise this upper limit. As the proportion of suspended material is reduced the size of the particles may be increased.

In the above two paragraphs there appear to us to be at least six possible variables.

7. The temperature may be from "below 1000° C." to "substantially exceeding 2000° C."

8. Appellant discloses that "very small and precise quantities of cadmium or other slow-neutron absorbing materials" may be placed in the "special liquid" itself "where the 'special liquid' circulates as a liquid." When "stabilization is at a higher temperature" appellant states that "It is preferable * * * that the liquid should be completely free of all traces of such stabilizing materials and that the latter should be carried by separate [cadmium and boron] screens suitably disposed [in the walls of the reaction chamber] adjacent the special liquid." As to what may be a "small and precise" quantity of cadmium, it is stated:

The amount of cadmium * * * must be such that, at a temperature chosen as the critical upper limit, the cadmium will absorb such a proportion of the neutrons circulating between the special liquid and the * * * container that the atomic decomposition will be stopped.

Appellant disposes the cadmium in a cooling fluid which circulates continuously in ducts in the reaction chamber's walls. The boron screen is disclosed as adjacent the cadmium screen and consists of gaseous or liquid boron placed in ducts surrounding the inner wall of the reaction chamber. By removing the boron from its respective tubes, the mass of the reaction chamber, disclosed as being "of steel of the order of 50 cm.," outside of the tubes is allowed to serve "as a cover, reflecting the neutrons and projecting them back into the active mass, thus reducing the loss of the neutrons to the outside. This will result, as is known, in reducing the critical radius and the minimal critical mass to the value of the order above indicated."

9. Very rapidly appears to be defined in the specification as "approximately in .001 of a second."

10. "Projected" refers to the shooting or throwing of the "special liquid" as a foam from the reaction chamber that takes place in some of appellant's disclosed embodiments, which occurs due to the vapor pressure build-up that is generated as liquid metal is heated and vaporizes.

11. As to the relative size of the "narrow container," in which nuclear fission or decomposition takes place, and the "heat exchanger," appellant's specification states:

* * * the volume of this heat exchanger can be for instance 100 times larger than the volume of the decomposition and launching chamber.

As to "launching", the specification says: "The described system represents actually a cannon, shooting at a very low velocity (several meters or dozens of meters per second) a metallic mass of 30 to 50 tons."

12. Such a fluid may be water, or, as appellant states—

* * * it may be preferable to substitute for the water a liquid metal which

changer. The special liquid, after transmitting its heat in the heat exchanger to another fluid and being thus cooled, is again collected in the narrow container where the decomposition has taken place (or in another similar container) to undergo a new atomic decomposition, new heating, and new projection to the heat exchanger."

As to the power which can allegedly be achieved by the invention, which appellant's specification says "relates * * * particularly to the construction and operation of an atomic decomposition power plant," it is stated:

"The present invention, based on a principle substantially different [from fixed fuel reactors], has for its object [inter alia] the * * *:

"Extraction or removal of the energy of the order of one million HP and over from a unit power plant."

The foregoing, while omitting many details, should serve to indicate the nature of the invention and the disclosure of it.

The position of the Patent Office, as it was in the earlier case heard in 1955, is that the disclosure is not in compliance with section 112, that it is fatally defective. It has spared no details, in the course of a 30-page board opinion in explaining why. We see no need to recite all of them again. We shall content ourselves with stating in a general way what they are and why appellant's arguments have not persuaded us that the ultimate legal conclusion of the Patent Office tribunals is wrong.

The solicitor's brief thus summarizes the Patent Office position (omitting references to the record):

"The Board of Appeals agreed with the examiner in his holding that the specification was insufficient to comply with the requirements of 35 U.S.C. 112, accepting the examiner's position as their own,

and incorporating his discussion of the deficiencies of appellant's disclosure in their decision [opinion]. The major defects in the application are summarized in the decision as (1) failure to teach the need for enriching natural uranium with the $U^{235}$ isotope, and to indicate [1(a)] the amount of enrichment necessary in order to obtain an operative process producing useful power; (2) failure to teach the critical mass of uranium required for a heat producing reaction; (3) failure to teach the critical geometry, particularly as to the uranium particle size; and (4) failure to disclose a proportion of carbon to uranium sufficiently high to permit maintaining the chain reaction."

Appellant has two general approaches in arguing that this position of the Patent Office is untenable. First, appellant contends that no disclosure of how to produce the nuclear reaction which produces the desired power in the form of heat is necessary because the art already knew how to do that; second, the disclosure is in fact adequate to enable "any person skilled in the art" to practice the invention.

■■ The asserted legal basis of the first approach is a phrase out of Webster Loom Co. v. Higgins et al., 105 U.S. 580, 586, 26 L.Ed. 1177, from which case appellant quotes the "principle" which he thinks should apply, which he calls the "Webster v. Higgins rule," saying "the applicant 'may begin at the point where his invention begins, and describe what he has made that is new and what it replaces of the old. That which is common and well known is as if it were written out in the patent and delineated in the drawings.'" The quotation or supposed rule fails to fit the facts here either as to the point where appellant's invention, as he describes it, begins or as to what was "common and well known." Appellant did not begin with an old and well-

is heated in the heat exchanger and is then conducted to a separate boiler for producing steam. Such a metal, prefer-

ably sodium or potassium or their alloys, may be circulated in a closed circuit through the heat exchanger * * *.

known nuclear reactor, the heat from which he decided to make use of in a novel way. He began with a new type of reactor involving the distribution in a molten liquid metal of his uranium fuel, this mixture or solution being his "special liquid." It appears that reactors of this general type later came to be known as "homogeneous reactors." His attorneys argued in an amendment in 1956, "As to the homogeneous reactor method applicant was a pioneer." Dr. Borst, an affiant on whose learned opinion appellant heavily relies, stated:

"When Chilowsky filed his application, he disclosed for the first time, as far as I know, the idea of suspending the enriched fissionable material in a fused metal, or the conditions for dissolving the enriched fissionable material in a fused metal, whereby the entire mass could be projected intermittently, or circulated continuously.

"In my opinion, this was a basic and clearly disclosed improvement, when Chilowsky filed his application."

Another highly competent affiant, Dr. Livingston, Director of the Cambridge Electron Accelerator at Harvard University, stated, as his expert opinion:

"That the concept of dispersing a nuclear fuel in a heat exchange fluid and having a nuclear reaction occur within this fluid and further conducting the fuel and fluid to a heat exchange unit was, to the best of his knowledge, a new and novel concept in 1944 * * *."

While we have never been able to see a distinction, at least in patent law, between the recognized synonyms "new" and "novel," this commonplace pleonasm at least serves to emphasize the point that Chilowsky could not start to describe *his* invention with the assumption that those skilled in the art knew in detail how to build *his* nuclear reactor. Since it was a major part of what he purported to have invented, it was incumbent on him, under section 112, to tell how to build it, under principles of patent law too elementary to require discussion.

Our own reading of the Chilowsky application and the literature of record disclosing the state of the art at the time it was filed leads us to the same conclusion, namely, that Chilowsky's invention consisted of a new kind of nuclear reactor *coupled with* several ideas for heat exchanger arrangements to be used in conjunction with it. Appellant's brief emphasizes the existence of other "homogeneous" reactors known as LOPO (low power) and HYPO (high power) which "went critical" in May and December of 1944 respectively, in the same year in which Chilowsky filed the two applications here relied on for disclosure. Our knowledge of them is limited to the first page of an article describing them,[13] which is all appellant put into the record. This article was not published until July, 1951. HYPO had a power of 1 kilowatt and before shutdown on July 7, 1945, had been in operation but 1000 kilowatt hours. This is a long way from the power intended by Chilowsky. But of most significance is the fact that these reactors operated with "an *aqueous* uranyl salt solution enriched in $U^{235}$." (Our emphasis.) Those skilled in building that kind of "homogeneous" reactor art cannot be expected to have had knowledge of how to construct Chilowsky's liquid molten metal reactor using a uranium-containing "special liquid" and operating at temperatures which may exceed 2000° C., notwithstanding the "homogeneous" designation is given both to it and to LOPO and HYPO.

In any event we have it from the mouths of Chilowsky's own attorneys in their brief before the board that "This application and the claims are directed to a process and apparatus of *conducting a nuclear reaction in a particular way* so as to provide a method of extracting a maximum amount of heat from said reaction." [Our emphasis.]

---

13. Review of Scientific Instruments, Vol. 22 (July 1951), p. 489.

For the foregoing and other reasons, we cannot see any merit in appellant's first general approach, epitomized in his brief where it says, "Appellant has never claimed to be the inventor of a fissioning (atomic decomposition) process *per se*." It no doubt is true that he has never contended that he discovered atomic fission or the first method of carrying it out, or that he invented the first nuclear reactor. But he certainly has disclosed his invention as including a new kind of reactor. The record simply does not support the suggestion that his reactor was already "common knowledge" even to those possessed of the utmost skill in the atomic fission art, so that no description *of it* in compliance with section 112 was required. If one examines the Webster Loom case to see what the court was talking about when it uttered the words relied on by appellant, it will be seen that the situation had little if any similarity to the facts here. The Supreme Court was discussing terms describing parts of pile-weaving looms and their operation in looms which had been in common use for many years, about which it said, "—all these things were as well known as the alphabet to all those skilled in the art of pile weaving."

Another case cited by appellant purporting to establish a "principle" that a disclosure is sufficient if one skilled in the art could render it operative by "adjustments and corrections which would naturally occur to a skilled worker in the art attempting to construct the apparatus on the basis of the application disclosure" is Bennett v. Halahan, 285 F.2d 807, 48 CCPA 782. We again issue a warning as to the inadvisability of making principles of law of general application out of words dealing with unrelated fact situations. What we were there talking about was a slide projector mechanism and the *only* inadequately disclosed part of that mechanism was a little pawl as to which we said, "conven-

tional pawl and ratchet mechanisms have long been well known in the art which could be employed in an obvious manner by any person skilled in the art * * *." We were not discussing anything comparable to nuclear reactors.

We turn now to the adequacy of disclosure issue. We shall discuss briefly the points made in the above quotation from the solicitor's brief, using the numbers therein given.

(1) Most of the argument in the case centers on failure of the application to teach that it is not just "uranium" that is needed in the reactor as fuel, but that uranium "enriched" with the fissionable isotope $U^{235}$ is essential. It cannot be denied that there is no mention whatsoever in the application at bar of either enrichment or $U^{235}$. One reading the application would not be aware that Chilowsky had ever heard of $U^{235}$. This lack does not seem to be denied by appellant but he seeks to remedy it by use of what was said in another copending application, Ser. No. 517,574 (now said to be abandoned after a final District Court adjudication that its disclosure was inadequate), which application is not in the record here. However, there are references to what it is alleged to contain, not disputed by the Patent Office. The most appellant can eke out of these references is that which he had attempted to transfer to the instant application by amendment (which stands objected to as "new matter"), namely, that there are "advantages to be gained by enrichment of such [natural] uranium by enrichment of such uranium with $U^{235}$ or other related materials." This is little more than a suggestion that enrichment might be desirable under some circumstances.[14] Even this is to some extent counteracted by another statement in the copending application, pointed out by the examiner, stating:

"When the word uranium is used herein without other specification

14. Natural uranium consists of approximately 99.3% of $U^{238}$ which absorbs thermal neutrons without fission and 0.7% $U^{235}$ which fissions when bombarded by them, with the release of, inter alia, energy and the production of more neutrons.

this natural uranium *with its normal composition* either as an element or as a compound is meant." [Our emphasis.]

The instant application uses the word "uranium" throughout, either in naming the metal itself or its compounds. If appellant wants us to import what is in the other application to the principal one, it would seem that we should import the above definition as well. Doing so would normally preclude a finding in the instant application of a disclosure of enriched uranium. So appellant has also added, in a proposed amendment, the statement that—

"Reference herein to 'uranium' will therefore be understood as not implying the exclusion of such equivalent or related materials as may seem desirable."

Appellant's desired transfer of statements from a copending application referred to in the principal application may by itself be permissible, but when there is added thereto an additional qualifying statement which may change the meaning of the added statement, we think the entire insertion is properly objected to as "new matter."

(1(a)) Assuming one skilled in the art would realize from mere mention in the specification of "uranium," that enriched uranium had to be used, the disclosure still does not mention the degree of enrichment contemplated. This defect alone we feel renders this disclosure fatally defective. It is clear that in 1944 the art recognized that varying the degree of enrichment in a nuclear reactor using uranium as a fuel would greatly affect the neutron multiplication factor $K$, which must be greater than unity if there is to be a chain reaction at all. The record clearly shows that the fairly precise approximation of this factor is one of the prerequisites of any reactor design. Appellant directs our attention to the statements concerning enrichment appearing in the Review of Scientific Instruments article previously noted, seeming to imply that one skilled in the reactor art would expect the same degree of enrichment used in the LOPO and HYPO "Water Boiler" reactor to be used in appellant's reactor. For obvious reasons these statements do not aid appellant. The LOPO and HYPO reactors, both being of relatively small size, would involve relatively high neutron losses. We are unable to conclude, from the state of the art as it is represented before us, that anyone skilled in this art would expect the same degree of enrichment or the wide range of apparently permissible enrichment comprehended by the developer of this first aqueous fuel homogeneous reactor to be applicable in a homogeneous reactor of the size and operated in the manner disclosed in appellant's specification and using molten metal.

(2) and (3) The instant invention description fails, *inter alia*, to designate: (a) the particular size or shape of the claimed "reaction zone" or "atomic decomposition chamber" and "heat exchange zone" or "heat exchanger" other than in an approximate, relative size of 1 to 100 respectively; (b) the relative proportions [15] and amount of the claimed "uranium fuel" or "uranium" and "liquid metal" constituents other than those theoretically appropriate; (c) the critical mass, which by definition is a critical factor, for any particular uranium enrichment and uranium particle size, using any particular described "special liquid." [16]

---

15. The exact percentages of the various "special liquid" constituents which appear in appellant's specification and which are set forth in note 6, supra, are rendered meaningless by the additional recitation that these percentages are dependent on at least six variables, none of which are particularly defined in the specification. See the last two paragraphs of note 6, supra.

16. At the end of note 8, supra, it will be noted that appellant's specification refers to "the minimal critical mass * * * of the order above indicated." Although we have searched this record for the "above indicated" critical mass, we can find only a vague reference to a "large mass of a liquid metal, of the order of 30 to 50 tons." No indication exists that this mass is a "critical" one.

(4) The proportion of carbon to "uranium," whatever the latter is taken to mean, necessary to cause and sustain a chain reaction, is a relative matter depending on the degree of enrichment at least. Even if we read the application as contemplating enrichment, which it does not appear on its face to do, no specific proportion for any assumed degree of enrichment is disclosed.

We have carefully considered the several affidavits, some by very distinguished experts, relied on by appellant. They have unquestionably been prepared with meticulous care and we assume the honesty of the affiants. In some respects some of them undertake to tell us (or the Patent Office) the answer to the ultimate legal question which we must decide, viz., when is an application sufficient under the *law*. In his respect they are not only expressions of opinion but incompetent expressions. We have been unable to find in the *facts* which the affidavits support a basis for deciding that Chilowsky has complied with the requirements of section 112. In large part they are directed to establishing that in 1944 there were perhaps 25 people in the United States, not cloistered inside the Manhattan District or Project (the name of the government atomic bomb enterprise), who could, with an undisclosed amount of effort, imagination, experimentation, and possibly invention, have taken the Chilowsky application disclosure and ended up, after an undisclosed time (assuming no financing problem), with a sustained chain reacting system. Affiant Livingston made a very significant statement when he said

"That there were at least 100 competent personnel outside the Manhattan District in 1944 who could have read the disclosure of Chilowsky and proceeded to *experiment* and

*develop* the process to accomplish a practical result as *proposed* by Chilowsky, *although this may have required considerable modification of the disclosed process*; * * *." [Our emphasis.]

On the whole record, we cannot find error in the ultimate holding of the board which concisely sums up the situation, saying:

"We * * * find ourselves in complete agreement with the examiner in his holding the present disclosure to be insufficient to *teach* one skilled in the art *how* an operative heat producing neutron reaction may be accomplished without most extensive further research and, in fact, the exercise of inventive ingenuity."

We have nothing to add except the emphasis in the above paragraph.

Our decision on insufficiency of disclosure makes it unnecessary to consider other aspects of the rejection since this one goes to the allowability of all claims appealed.

The board's decision is *affirmed*.

AFFIRMED

MARTIN, J., did not sit or participate because of illness.

WORLEY, Chief Judge (concurring).

In stating my accord with the result reached below and affirmed here, I deem it appropriate to express appreciation for the thorough and efficient fashion in which the Patent Office responded to this court's remand in In re Chilowsky, 229 F.2d 457, 43 CCPA 775. Would that the Office had sufficient time and personnel to accord all applications the same thorough treatment.